# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 08-MD-01916-MARRA

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

**This Document Relates to:**

**ATS ACTIONS**

_____/

## ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS
## BASED ON *FORUM NON CONVENIENS* &
## DENYING IN PART AND GRANTING IN PART DEFENDANT CHIQUITA'S
## MOTION TO DISMISS NEWLY-ADDED NEW YORK AND D.C. PLAINTIFFS
## ON STATUTE OF LIMITATIONS GROUNDS

**THIS CAUSE** is before the Court on Defendants Chiquita Brands International, Inc. and Chiquita Fresh North America LLC [collectively, "Chiquita"]'s motion to dismiss on grounds of *forum non conveniens* [DE 741], in which all Individual Defendants have joined [DE 735, p. 39]. In addition, Defendant Chiquita has moved to dismiss the Colombian law claims of certain newly-added plaintiffs in the New York Action [Case No. 08-80480-CV-MARRA] and District of Colombia Action [Case No. 08-80465-CV-MARRA] on statute of limitations grounds [DE 741]. Following careful review of the motions, together with the Plaintiffs' responses in opposition [DE 819, 821, 823, 832] and the Defendants' replies [DE 899, 904, 905], the Court is denying Defendants' joint motion to dismiss on grounds of *forum non conveniens* and is denying in part and grant in part Defendant Chiquita's motion to dismiss certain newly-added Plaintiffs in the New York and District of Colombia Actions.

# I.    Background[1]

Plaintiffs allege that Defendants associated and conspired with known members of a violent paramilitary organization in Colombia, the Autodefensas Unidas de Colombia ("AUC"), as well as other Colombian guerilla groups, to suppress labor unrest and drive left-wing influences from the banana-growing regions of Colombia where Chiquita formerly operated its Colombian subsidiary ("Banadex"). The activity allegedly led to the murders of Plaintiffs' family members who lived and worked in those regions.   Because a substantial portion of the events giving rise to Plaintiffs' claims occurred in Colombia and implicated conduct of Colombian paramilitaries allegedly operating in symbiosis with Colombian police and military figures, Defendants invoke the doctrine of *forum non conveniens* as a basis for dismissal of all of Plaintiffs' claims.

## II.   Discussion

### A.   *Forum Non Conveniens*

The common law doctrine of *forum non conveniens* permits a trial court to dismiss a case over which it has jurisdiction, where factors of convenience and justice indicate that the matter should be tried in another forum.  *Ford v. Brown*, 319 F.3d 1302, 1307 (11th Cir. 2003) (quoting *Sibaja v. Dow Chem. Co.*, 757 F.2d 11215, 1218 (11th Cir. 1985)); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3828 at 278 (2d ed. 1986).  It is a drastic exercise of the court's "inherent power" to decline jurisdiction in exceptional circumstances, viewed as "an exceptional tool to be employed sparingly, [not a] … doctrine that compels plaintiffs to choose the optimal forum for their claim." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002) (quoting *Ravelo Monegro v. Rosa,* 211 F.3d 509, 514 (9th Cir. 2000)).

---

[1] The Court set out the factual background of the cases consolidated in this MDL proceeding in prior orders [DE 412, 1110] and will not repeat the facts here except where necessary.

To justify dismissal of an action based on *forum non conveniens*, a defendant must show: (1) an adequate alternative forum is available; (2) the relevant private and public factors weigh in favor of dismissal, and (3) the plaintiff is able to reinstate his suit in the alternative forum without undue inconvenience or prejudice. *Leon v. Millon Air, Inc*., 251 F.3d 1305, 1311 (11th Cir. 2001); *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1308 (11th Cir. 1983). The defendant bears the burden of persuasion on all elements, including the initial burden of demonstrating that an adequate, alternative forum is available. *Leon*, 251 F.3d at 1310 (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A*., 119 F.3d 935, 951 (11th Cir. 1997)).

The Supreme Court has identified the relevant private interest factors to include the residence of the parties and witnesses; the forum's convenience to the litigants; relative ease of access to physical evidence and other sources of proof; availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; the enforceability of the judgment and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09, 67 S. Ct. 839, 843, 91 L. Ed. 1055 (1947). Relevant public interest factors -- which come into play only when the private interest factors are "at or near equipoise" -- include the local interest in the lawsuit; the court's familiarity with the governing law; the burden on local courts and juries; congestion in the court, and the costs of resolving a dispute unrelated to the forum. *Id.* at 1147; *Pierre-Louis v. Newvac Corp*, 584 F.3d 1052, 1056 (11th Cir. 2009).

Because this case may be characterized as primarily a Colombian dispute, Plaintiffs' choice of forum, as foreign plaintiffs, is afforded "less deference," but this does not mean it is entitled to "no deference." *Tuazon v. R.J. Reynolds Tobacco Co*., 433 F.3d 1163, 1181-82 (9th Cir. 2006);

3

*Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000); *Lony v. EI DuPont de Nemours & Co.*, 935 F.2d 604 (3d Cir. 1991).

On a motion to dismiss based on *forum non conveniens* decided without a factual hearing, a court must accept the facts alleged in the plaintiff's complaint as true. *Aguas Lenders Recovery Group, LLC v. Suez, S.A.,* 585 F.3d 696, 697 (2d Cir. 2009). The Court may also review extraneous evidentiary submissions, drawing all reasonable inferences and resolving all factual conflicts in favor of the plaintiff. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258-59 (1981) (although detailed offers of proof are unnecessary, a defendant must submit sufficient information to allow the court to balance the parties' interests); *Van Cauwenberghe v. Baird*, 486 U.S. 517, 529 (1988) (district court's inquiry may be resolved on affidavits); *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 121 (S.D. Fla. 2004).

### 1. Adequacy and Availability of Colombian Forum

The first prong of *forum non conveniens* analysis requires two distinct inquiries: whether the alternative forum is "adequate" and "available." *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1330 (11th Cir. 2011) (quoting *Aldana v. Del Monte Fresh Produce, N.A.,* 578 F.3d 1283, 1290 (11th Cir. 2009).

### a. Availability

An alternative forum is considered "available" to a plaintiff "when the foreign court can assert jurisdiction over the litigation sought to be transferred," a requirement ordinarily deemed satisfied when the defendant is "amenable to process" in the other jurisdiction. *Piper Aircraft*, 454 U.S. at 254 n. 22, 102 S. Ct. 252; *Leon,* 251 F.3d at 1311.

In this case, Defendants contend that Colombia is an "available" alternative forum because all Defendants are amenable to process in Colombia based on Chiquita's past activities

4

in the country, and because all Defendants have in any event stipulated to (a) service of process and consent to jurisdiction in Colombia and (b) tolling of relevant Colombian statutes of limitations from the date the named Plaintiffs' claims were filed in the United States.

Recognizing that an agreement by a defendant to submit to the jurisdiction of the foreign forum typically satisfies the availability requirement, *Tang v. Synutra Int'l Inc.*, 2010 WL 1375373 at *5 (D. Md. 2010), *aff'd* 656 F.3d 242; accord *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1429 (11th Cir. 1996), and that the Defendants' limitations waiver avoids any absolute filing bars in Colombia which may otherwise have arisen since the filing of this lawsuit, the Court concludes that the Defendants have adequately satisfied the availability requirement.

**b. Adequacy**

An alternative forum is "adequate" when it provides for litigation of the subject matter of the dispute and potentially offers redress for plaintiffs' injuries. *King v. Cessna Aircraft Co.,* 562 F.3d 1374, 1382 (11th Cir. 2009). Courts need only ask "whether some remedy exists; whether the remedy afforded is less favorable in the foreign forum is not determinative." *Neuralstem, Inc. v. ReNeuro, Ltd.*, 365 Fed. Appx. 770, 771 (9th Cir. 2010) (per curiam). The adequacy of the forum also "does not depend on the existence of the identical cause of action in the other forum." *Norex Petrol Ltd. v. Access Indus, Inc.*, 416 F.3d 146, 158 (2d Cr. 2005). Put another way, "[a]n adequate forum need not be a perfect forum." *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001). On the other hand, an alternative forum is inadequate "if the remedy provided … is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft*, 454 U.S. at 252, 254, 102 S. Ct. 252; see also *Tazoe,* 631 F.3d at 1130-1331.

Defendants here contend that Colombia offers a substantively "adequate" forum as evidenced by civil legal remedies available to Plaintiffs in Colombia. For example, Defendants

argue that Plaintiffs could pursue civil litigation against Defendants in Colombia, noting that approximately 1,700 other Colombian citizens have brought mediation demands in their own names against Chiquita (as a procedural prerequisite to a Colombian suit) for its role in aiding the violent acts of Colombian paramilitaries. Tamayo Decl. ¶¶50-52; De la Calle Decl. ¶¶ 9-11. Defendants also show that Colombian civil law authorizes claimants to recover compensatory damages – including tangible and intangible damages – from parties at fault for wrongful death or personal injury inflicted by others. Tamayo Decl. ¶¶ 29-35, 50-52; De la Calle Decl. ¶¶ 9-10. In addition, Defendants contend that Plaintiffs could join the tens of thousands of Colombian citizens who have already registered – using their own names -- with Colombian authorities as victims demanding redress from former AUC members through the government-sponsored Justice and Peace program, a process under which demobilized paramilitaries are granted reduced prison sentences in exchange for laying down their arms, telling the truth about their crimes and turning over ill-gotten assets to a victims' reparation fund. Tamayo Decl. ¶¶ 54-61; Arrubla Decl. ¶¶ 57-58.

Plaintiffs have several responses to Defendants' assertion that Colombia is an adequate alternative forum. First, they question the adequacy of a forum in which their claims may be time-barred, observing that the Defendants' purported waiver of local statutes of limitations may be found unenforceable in Colombia as against public policy. Second, they question the adequacy of a forum in which each individual Plaintiff would be required to file a separate lawsuit because the statute of limitations for filing class actions in Colombia has, by this point, long since lapsed, and consolidation of their claims in one suit is highly unlikely under Colombian law. Arrubla Decl. ¶ 48. Finally, Plaintiffs question the adequacy of a forum which they contend poses grave security risks to the majority of claimants who still live in the banana-

growing regions of Colombia, where they suffered harm and where they would be required to file civil claims under their own names. Arrubla Decl. ¶ 16; Calderon Decl. ¶ 13. In these areas, present-day paramilitaries, narcotics-traffickers and other armed groups continue to dispute territory and control the drug trade, and violence against individuals seeking redress for paramilitary abuses is still commonplace. Lopez Decl. ¶¶ 11-12.

In the latter connection, Plaintiffs have produced substantial evidence of security risks likely to attend the litigation of their claims in a Colombian forum, conditions severe enough to call the adequacy of the foreign forum into doubt, as more particularly discussed below. Therefore, Defendants have the burden of persuading the Court that the facts are otherwise in order to meet their ultimate burden of persuasion on the issue of the adequacy of the alternative forum. *Leon,* 251 F.3d at 1312. Upon careful review of the parties' competing proofs on this point, the Court concludes the Defendants do not meet this burden.

According to Plaintiffs' expert declarations, including that of Colombian lawyer and professor Federico Andres Paulo Andreu Guzan ("Andreu") dated June 19, 2015 [DE 837-17], Colombia remains an extraordinarily dangerous place to conduct litigation involving human rights abuses: Between 2009 and 2015, at least 335 human rights defenders were murdered, with 95% of the murders committed between 2009 and 2013 left unpunished. Andreu Decl. ¶¶ 17, 57. In 2015, there were 295 reported attacks on human right defenders over a period of three months, representing a 300% increase over the same period from 2014. *Id*. at 56. In Antioquia, the department where Uraba is located and most of the plaintiffs reside, there were 95 attacks against human rights defenders in 2014. *Id*. at 67. Antioquia remains a haven for paramilitary groups which have formed from remnants of the same paramilitary groups supported by Chiquita in the 1990s and early 2000s, and violence in this area is predicted to increase as waves of

paramilitaries (who faced maximum eight year sentences as participants in the Justice and Peace process) become eligible for release from prison. *Id.*

Victims' advocates in Colombia, including lawyers, are also at risk. For example, human rights defenders filing suit against businessmen who collaborated with paramilitaries to displace communities in Choco (near Uraba) were subjected to death threats and assassination attempts. Additionally, in 2012, paramilitaries offered a $120,000 reward for an attack on a human rights lawyer known for working on paramilitary cases, including cases relating to violence against union leaders. Andreu Decl. ¶ 66. Lawyers representing victims seeking reparations through the Justice and Peace process have also been targeted, including Ricardo Rodriguez Cajamarca (killed in 2013), Ricardo Alberto Sierra (killed in 2011) and Gisela Canas (death threats in 2011). Victims seeking restitution for land wrongfully confiscated by paramilitaries have also been targeted, such as Jesus Adan Quinto (killed in April 2014 in Turbo, the location of Chiquita's private port), and Manuel Antonoio Ruiz (disappeared in March 2012 after recovering a $1600 restitution award). Andreu Decl. ¶ 67, 79. These threats are amplified by state-sponsored intimidation of victims' advocates, including illegal surveillance, public vilification and criminalization of human rights advocates for vaguely defined crimes. Andreu Decl. ¶ 26.

According to Senator Claudia Lopez Hernandez, a political science professor and Senator in the Congress of the Republic of Colombia, ex-paramilitaries continue to pose a particularly high security risk in Uraba, where old paramilitary groups still operate, albeit under different names, such as Los Rastrojos, Urabenos, Aguilas Negras and Gastrillos Rojos. Lopez Decl. ¶15. These groups frequently intimidate human rights defenders and victims seeking resettlement benefits. As recently as August 2013, Los Rastrojos circulated a pamphlet declaring several unionists and human rights organizations as military targets, and accusing associated attorneys of

"slowing the progress of multinational companies such as Glencore, Drummond, Pacific Rubiales, AngloGold Ashanti." Lopez Decl. ¶¶15, 17-18. The Inter-American Commission on Human Rights recorded approximately 68 violations of the right to life of human rights defenders in Colombia between 2006 and 2010, including five forced disappearances, and in 2010 alone, 1,597 people were murdered outside of combat for sociopolitical reasons. Lopez Decl. ¶10. Lawyers representing victims of paramilitary abuses in cases against businesses in the banana sector of Colombia, particularly in the Uraba region (department of Antioquia), remain at heightened risk for intimidation and attack. *Id.* ¶ 8 (i) - 9 (citing 2011 Report of Office of the United Nations High Commissioner for Human Rights in Colombia).

Defendants are dismissive of Plaintiffs' evidence on security concerns, complaining that the Andreu and Lopez declarations rely on dated statistical evidence, ignore the dramatic security gains that the country has achieved in recent years, and do not distinguish between the risks attendant to cases brought against primary wrongdoers (e.g. paramilitaries, police) as opposed to secondary wrongdoers (e.g. foreign entities charged with providing financial support to paramilitaries).

Defendants also offer several counterarguments to the perceived security risks. First, they argue since all Plaintiffs currently reside in Colombia, whatever security risks might attend a lawsuit against Chiquita based on its alleged role in supporting the AUC would be the same regardless of the forum (i.e. Plaintiffs' Colombian home base is a constant risk factor in both forums). Second, Defendants posit there is no real security risk associated with suing Chiquita or its employees in Colombia in the first instance, because such a suit would not directly threaten the economic interests of any primary wrongdoers (paramilitaries) so as to create a motive to retaliate. In response to Plaintiffs' concerns that they could end up directly confronting primary

9

tortfeasors in a Colombian lawsuit as a product of third-party impleader practice, Defendants agree to forbear engaging in such third party practice as a condition of dismissal of this suit in favor of the Colombian forum [DE 899 p. 14]. Finally, Defendants posit that government forces are now more efficiently policing the municipalities which paramilitaries previously controlled, and that security in Colombia has vastly improved over the last three years due to demobilization of paramilitaries and the government's oversight of the Justice and Peace Law, diffusing the threat of retributive violence which may previously have existed in these areas. Shifter Decl. ¶¶ 26-27.

While Defendants do not dispute that sociopolitical violence by paramilitary successor groups still plagues the Uraba region, they downplay the significance of this evidence with the hopeful observation that the Colombian government has been taking an increasingly hard stance on violence against human rights offenders and labor leaders, and the optimistic belief that government intervention in this vein will generate the desired deterrent effect. Shifter (Second) Decl. ¶¶ 29, 31, 22-23.

These optimistic forward-looking statements do little, however, to detract from the unrebutted evidence that participation in human rights litigation involving paramilitary abuses in Colombia, particularly in the Uraba region, is currently a very dangerous proposition, regardless of whether paramilitary figures are directly implicated in the litigation. To assume, as Defendants advance, that there is little security risk posed by Plaintiffs' prosecution of litigation which does not directly name or implicate the economic interests of paramilitary malefactors is a leap of faith the Court is not willing to make.

Accepting the description of current conditions in Colombia set forth in the Andreu and Lopez declarations as true, particularly as these conditions pertain to the banana-growing regions

where most of the plaintiffs reside and where any Colombian lawsuits would necessarily be filed, the Court concludes that the litigation of Plaintiffs' claims in Colombia would pose an extraordinary and avoidable risk of harm to Plaintiffs, and that Plaintiffs' fears about retaliation from current or former members of paramilitary groups operating outside the Justice and Peace process are reasonably justified. Defendants have not persuaded the Court that the risk factors described by Plaintiffs do not apply to this case.

In sum, while the Court recognizes that a Colombian forum can offer some remedies for Plaintiff's claims, it does not find these remedies meaningful in light of the significant possibility of harm likely to attend the litigation of these claims in a Colombian forum. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F. Supp. 2d 289, 336 (S.D.N.Y. 2003) (finding alternative forum inadequate because of risk of harm posed by plaintiff' return to home country); *Cabiri v. Assasie-Gyimah,* 921 F. Supp. 1189, 1199 (S.D.N.Y. 1996) (same). *See generally Iragorri v. Int'l Elevator, Inc.,* 203 F.3d 8, 14 (1st Cir. 2000) (considering plaintiffs' safety relevant to suitability of proposed alternative forum).

Defendants have thus failed to carry their burden of proof on the threshold criterion of "adequacy," and, for this reason alone, the motion to dismiss on *forum non conveniens* grounds is denied. *See e.g. Mujica v. Occidental Petroleum Corp.,* 381 F. Supp. 1134 (C.D. Cal. 2005). Although this could end the inquiry, the Court will proceed to address the relevant private and public interest factors in the interest of exhausting its analysis.

**2.  Private Interest Factors**

**a.  Residence of the parties and witnesses**

Defendants argue that the residence of all of the plaintiffs and the vast majority of witnesses is Colombia. Potential witnesses include paramilitary figures, members of the

Colombian military and police, eyewitnesses, Colombian government officials, former Banadex employees and forensic medical personnel.

On this factor, the court focuses on "the materiality and importance of the anticipated witnesses' testimony," not the number of witnesses in each location. *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335 (9th Cir. 1984). While the claims consolidated in this proceeding do involve thousands of foreign Plaintiffs who reside in Colombia, preservation of their testimony by deposition is one option for mitigating the cost of travel to trial in the United States, and use of bell-weather trials is another. In any event, by filing suit in the United States, Plaintiffs have indicated a willingness to travel to this country for trial if needed to testify.

Ultimately, travel expense is a sizable obstacle regardless of whether this litigation proceeds in the United States or Colombia, as local witnesses in the United States would be required to bear the inconvenience and cost of travel to South America if the case proceeded to trial in Colombia, as would large teams of attorneys on both sides. Likewise, pretrial deposition discovery will necessarily involve substantial attorney travel to Colombia regardless of whether the case is lodged in a Colombian or United States forum.

Finally, the liability issues in this case do not turn on the physical location of the murders, but on the mental state of the defendants allegedly involved in business decisions that gave rise to the injuries claimed by Plaintiffs. This critical evidence is primarily local to the United States. Under these circumstances, the Court finds the residence of the parties' factor to be neutral.

### b. Convenience to the Parties

Bearing in mind Plaintiffs' claims about the inadequacy of the Colombian forum due to security risks which attend it, and Plaintiffs' election of a United States-based forum, the instant forum is presumably more convenient to the Plaintiffs.

Defendants argue it would be more convenient for them to defend Plaintiffs' claims in Colombia, however, because this would ensure Chiquita's ability to implead other responsible third parties and allow all related claims to proceed in a single forum. Defendants contend this option would not be available to them if the claims were to proceed in the United States due to lack of personal jurisdiction over most potentially liable third parties, which Defendants generically describe as "some or all of the AUC's sponsors, including "drug barons, large landowners, industrialists … bankers … wealthy landowners, businessmen, and multinational corporations" [DE 741, p. 34 n. 23]. As a consequence of this jurisdictional impediment, Defendants contend they will undergo the unnecessary cost and inconvenience of filing separate contribution actions against such third parties if forced to defend the Plaintiffs' claims in the United States.

Plaintiffs concede the risk of this collateral cost to litigating the claims in this country, but argue that that any inconvenience to the Defendants attendant to a United States-based forum is justified by the need to protect Plaintiffs from the security risks associated with litigating their claims in Colombia. The Court agrees that the Colombian security factor for the Plaintiffs outweighs the convenience factor for the Defendants, and neutralizes what would otherwise be a private factor favoring the Defendants.

The Court also finds this factor neutral because (1) the Defendants have not specifically identified any third parties beyond the jurisdiction of this Court that they intend to implead and included in Colombian litigation, and (2) the Defendants have expressed a willingness to forego bringing third-party impleader claims as a condition for dismissing this case in favor of a Colombian forum, in effort to diffuse any security concerns that might otherwise give the Court

pause. Both points detract from the seriousness of Defendants' claimed interest in impleading third parties and neutralize this factor.

### c. Ease of Access to Relevant Evidence

Defendants urge that the vast majority of relevant and undiscovered evidence is located in Colombia. For example, in order to prove the underlying cause and circumstance of each individual murder, Defendants contend they will be required to examine a multitude of Colombian plaintiffs, eye-witnesses, government officials, military officials, former Banadex employees, and former paramilitaries located in Colombia. On the state action element, Defendants contend they will need to develop testimony of government officials at all levels of Colombian government, as well as former and current military and police officials, in addition to the discovery of Colombian government and judicial records from criminal investigations against paramilitaries.

In order to develop their "extortion" defense, Defendants argue they will need to depose former Banadex employees, paramilitaries and other witnesses who can confirm the threats allegedly made against Banadex and its Colombian employees; former paramilitaries convicted of extortion in Colombia, former paramilitaries who have publicly admitted to extortion; other individuals who have been the victims of extortion by illegal armed groups in Colombia, including officers of other companies that were asked to make payments; as well as Colombian military, police and government officials with knowledge of the government's alleged inability to protect Banadex operations from paramilitary and guerilla violence and extortion.

Defendants acknowledge, on the other hand, that key evidence related to the Defendants' state of mind is associated with Chiquita's corporate headquarters in Ohio, and other locations in the United States where pivotal meetings and decision-making took place, but argue the volume

of the United States-based evidence is dwarfed by that of undiscovered evidence located in Colombia.

Having carefully examined the elements of the claims and defenses at issue in this proceeding, the Court agrees this factor favors the Defendants, but disagrees that it is entitled to dispositive weight. Urging a contrary result, Defendants cite *Ford v. Brown*, 319 F.3d 1302, 1307 (11th Cir. 2003), for the proposition that is an abuse of discretion to deny a *forum non conveniens* motion where a defendant is charged with secondary liability for primary torts committed abroad and the bulk of relevant evidence is located in the foreign jurisdiction [DE 741 p. 12].

Defendants overstate the reach of *Ford,* however. In that case, an English barrister retained to investigate an explosion at a Hong Kong power station brought tort claims arising out of his firing from the case against an American corporation and its United States' counsel based on activity which allegedly occurred in Hong Kong. In reversing the denial of a motion to dismiss for *forum non conveniens,* the Eleventh Circuit criticized the district court's failure to give proper weight to the private factor of ease of access to evidence, noting the vast majority of evidence relevant to the underlying tortious conduct was located in Hong Kong. This was not a dispositive factor, however; the Court was equally critical of the district court's failure to give appropriate consideration and weight to comity concerns implicated by prior related litigation between the parties before a Hong Kong court which had issued a permanent injunction against the plaintiff's release of certain employment-related information. Noting that prosecution of a United States lawsuit could conceivably lead to contradictory fact findings and circumvention of the Hong Kong court's prior order, the Eleventh Circuit cited serious comity concerns as a factor tipping against retention of the litigation in a United States forum.

This instant case does not present comparable comity considerations, and *Ford* does not control the current inquiry. Suggesting otherwise, Defendants contend that Colombian lawsuits based on Chiquita's alleged role in AUC support could arise "at any moment" out of the 1,700 previously filed "conciliation" demands in Colombia, raising the possibility of conflicting judicial rulings at some future time and corresponding comity concerns which militate in favor of a *forum non conveniens* dismissal. Defendants acknowledge that none of the Colombian pre-suit demands has yet ripened into a civil case [DE 798 at 5-6], however. On this background, the Court rejects the speculative possibility of future related Colombian litigation as a touchstone for any legitimate comity concern in this proceeding. *Ford* is therefore inapposite, and while the ease of access to evidence factor is found to favor the Defendants, it is not entitled to dispositive weight under *Ford* or any other controlling precedent.

### d. Enforceability of a Colombian Judgment

Plaintiffs argue that they could not enforce any judgment obtained against Defendants in Colombia because no Defendant owns assets in that country which could be used to satisfy a judgment, and no Defendant has agreed to enforcement of a Colombian judgment. Consequently, if successful in obtaining judgments against Defendants in Colombia, Plaintiffs would be compelled to initiate multiple, costly and time-consuming enforcement proceedings in the United States, where the Defendants would be free to challenge any underlying foreign judgments on due process grounds.

Defendants do not dispute these facts and do not offer any compelling argument in rebuttal on this factor. With this, the Court finds the private factor of the enforceability of judgments to favor the Plaintiffs. *Carijano v. Occidental Petroleum Corp,* 643 F.3d 1216 (9th Cir. 2011) (defendant's lack of assets in Peru weighed against dismissal).

### 3. Public Interest Factors

The relevant public interest factors include (1) the local interest in the lawsuit; (2) the Court's familiarity with the governing law; (3) the burden on local courts and juries; (4) the congestion in the courts, and (5) the costs of resolving a dispute unrelated to a particular forum. *Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1181 (9th Cir. 2006).

### a. Local Interest

Defendants argue that Colombia has a far greater interest than does the United States in redressing grievances arising out of decades of abuses by Colombian paramilitaries and guerilla, noting that the Colombian government has in fact already taken a series of significant steps to facilitate the process of reconciliation and redress from Colombia's lengthy civil conflict, including implementation of the "justice and peace" law as well as passage of a victims law in 2011. Shifter Decl. ¶34; Tamayo Decl. ¶¶54-61. With "tens of thousands" of Colombia citizens already confronting AUC members, the Colombian government and other alleged collaborators in Colombia for their role in causing the claimant's injuries, Defendants posit  that Colombia has the stronger interest in resolving these disputes in order to achieve a "comprehensive resolution of the grievances" in one forum.

Colombia's stake in redressing human rights abuses committed on its own soil and against its own citizens is unquestionably a weighty one.  The more relevant question, however, is whether this clearly identifiable interest of the local Colombian forum justifies moving this litigation to Colombia despite serious security concerns and other logistical impediments to proceeding in that forum.

Further, the interest of Colombia in overseeing the dispute must be weighed against the interest of the United States in providing a forum for persons who are harmed by the actions of its corporate citizens. *Red Walen v. Hansen*, 933 F. 2d 1390 (8th Cir. 1991). The United States has a strong interest in monitoring and deterring unethical and illegal conduct of American corporations in supporting foreign terrorist organizations. The United States also has a strong interest in the uniform interpretation and enforcement of its own laws, including the TVPA, which provides the legal basis of Plaintiffs' claims against the Individual Defendants in this proceeding.

Although both forums have a significant interest in the litigation, the local interest factor favors neither side entirely. The Court therefore finds the "local interest" public interest factor to be neutral.

### b. Judicial Considerations

Defendants argue that this litigation will impose a greater burden on the courts of this country, where it will potentially obligate thousands of jurors in Florida, New York, New Jersey and the District of Columbia to decide claims having little relationship to their communities; in contrast, Defendants contend the litigation will pose "no unusual burden" on Colombian courts.

The Court does not find it unduly burdensome to seek the assistance of American jurors in resolving the civil liabilities of American corporations accused of misconduct in business operations abroad. As indicated above, this is not a purely localized controversy; both Colombian courts and the United States Courts have a strong interest in the subject matter of the litigation, and the burden on the respective jurors of either forum in deciding the controversy would be the same. The Court assigns neutral value to this is factor.

With only Colombian common law claims left pending against Chiquita, Defendants also argue that the difficulty of applying foreign law poses a substantial burden of conducting trial in a United States forum. Federal courts are frequently called upon to make such determinations, however, and this Court does not find this to pose an insurmountable burden. Further, given the current posture of this case, where federal statutory claims under the TVPA are now pending against the Individual Defendants, in addition to Colombian common law claims, the difficulty of applying Colombian law in this forum is offset by the parallel difficulty which a Colombian court would have in applying United States law.

Appreciating that the application of foreign law is an important factor to be considered in the public interest analysis, but it is not to be accorded dispositive weight, *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1104 (11th Cir. 2004), the Court finds this factor favors neither side.

### c. Comity Considerations

As noted, Defendants contend comity is a "significant concern" in this case because approximately 1,700 Colombian citizens have filed mediation demands against Chiquita in Colombia, as a mandatory pre-requisite to suit, claims which may mature into litigation "at any time." With this background, Defendants broadly assert that the Colombian legal system is "already entertaining actions similar to the ATS actions," creating comity concerns which warrant the dismissal of the current action in favor of a Colombian forum.

With no evidence before the Court regarding the status of any of the 1,700 "conciliation" demands, which have been pending for roughly five years [DE 98 at 5-6], the Court finds the suggestion of inchoate litigation too speculative a premise to identify a legitimate comity concern, and dismisses this factor as inapplicable.

#### 4. Undue Inconvenience or Prejudice

Turning to the final *forum non conveniens* requirement, the Court next addresses whether Defendants have carried their burden of showing that Plaintiffs are able to reinstate their suit in the proposed alternative forum "without undue inconvenience or prejudice."

Notably, the first-filed ATS suit consolidated in this MDL proceeding was filed in March, 2007, and the defendants did not seek dismissal based on *forum non conveniens* until November 2011. The ATS cases have now been pending before this Court for eight years. To disturb the Plaintiffs' choice of forum at this late juncture in the proceedings in favor of a foreign forum would undoubtedly cause "undue inconvenience" to the Plaintiffs, and would effectively prejudice both sides by delaying the adjudication of claims now at issue and with limited discovery already in progress. On this background, the Court finds this factor weighs strongly in favor of Plaintiffs.

#### 5. Weighing the Factors

The private factors based on residence of the parties and witnesses and convenience of the parties favor neither side; the ease of access to evidence factor favors the Defendants; the enforceability of judgment factor favors the Plaintiffs, and the public interest factors are all neutral. On the other hand, the inconvenience associated with reinstating the claims in the alternative Colombian forum at this late stage strongly favors the Plaintiffs. Considered together, the factors fail to show "oppressiveness and vexation to a defendant … out of all proportion to plaintiff's convenience." *Piper*, 454 U.S. at 241, 102 S. Ct. 252 (quoting *Koster*, 330 U.S. at 524, 67 S. Ct. 828); *Dole Food*, 303 F.3d at 1118.

Defendants had a substantial burden to persuade this Court to invoke the "exceptional tool" of *forum non conveniens* and deny the Plaintiffs access to a United States Court.

Defendants failed to meet that burden, and a proper balance of all the relevant factors supports the retention of this proceeding in this forum.

## B. Statute of Limitations

Chiquita also moves to dismiss the Colombian common law claims of certain newly-added Plaintiffs in the New York Action (*Does 1-888 v. Chiquita Brands International et al*., Case No. 08-80480-CIV-MARRA) and District of Colombia Action (*Does 1-144 v. Chiquita Brands Int'l, Inc.,* Case No. 08-80465-CIV-MARRA) on statute of limitation grounds. These claims are pending before the Court under its diversity jurisdiction. 28 U.S.C. § 1332.

A federal court sitting in diversity normally applies the choice of law rules of the forum state to determine statute of limitation applications. *Guaranty Trust Co v. York*, 326 U.S. 99, 108-109, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); *Interface Kanner, LLC v. JP Morgan Chase Bank*, 704 F.3d 927 (11th Cir. 2013), *cert. den*., 134 S. Ct. 175 (2013). In MDL matters involving cases that are filed in or removed to federal courts across the country and then transferred to the MDL court by the Judicial Panel on Multidistrict Litigation, however, the law of the MDL forum itself is not necessarily the proper source for choice of law standards. As to cases transferred under §1407, the MDL court typically applies the choice of law rules of each transferor court, i.e. the law of the state in which each action was originally filed. *See Ferens v. John Deere Co.,* 494 U.S. 516, 524, 110 S. Ct. 1274, 108 L. Ed. 2d 443 (1990); *Volkswagen Audi Warranty Extension Litigation*, 692 F.3d 4, 14 (1st Cir. 2012).

Because the New York and District of Colombia Actions have been transferred to this MDL proceeding under § 1407, this Court appropriately applies New York and District of Colombia choice of law rules in determining the relevant statute of limitations applications in

each case. *In re Air Disaster at Ramstain Air Base, Germany*, 81 F.3d 570, 576 (5th Cir. 1996) (where transferee court presides over several diversity actions consolidated under multidistrict rules, the choice of law rules of each jurisdiction in which the transferred actions were originally filed must be applied); *In re Volkswagen Audi Warranty Extension Litigation,* 692 F.3d 4 (1st Cir. 2012).

Because the choice of law rules in both New York and the District of Colombia treat statutes of limitations as procedural matters, the parties agree, and the Court finds, that the local law of each transferor court controls. Therefore, the Court will apply local statutes of limitations in determining Chiquita's current motion to dismiss. *A.I. Trade Financial, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454 (D.C. Cir. 1995); *Sheffer v. Novartis Pharmaceuticals Corp.*, 873 F. Supp. 2d 371 (D. D.C. 2012) (under established D.C. choice of law rules, a statute of limitations issue is procedural and therefore governed by the law of the forum); *Vincent v. Money Store,* 915 F. Supp. 2d 553 (S.D.N.Y. 2013). *See also Bouton v. BMW of North America*, 29 F.3d 103, 110 (3d Cir. 1994).

### 1. New York Action

Invoking the New York statutes of limitations governing battery (one year), wrongful death (two year), and general personal injury (three year) claims, NY CPLR §§ 214(5), 215, Chiquita seeks dismissal of the Colombian law claims of certain newly-added Plaintiffs in the New York Action as time-barred.

Using March 19, 2007 (the date Chiquita entered its guilty plea in the D.C. criminal case) as the latest possible date on which Plaintiffs were put on notice of their claims, and hence the most generous accrual date for equitable tolling purposes, and further accepting, *arguendo,* application of the three-year statute governing general negligence claims, Chiquita contends that

the wrongful death claims of all Plaintiffs added to the New York action after March 19, 2010 --
i.e. the 159 Plaintiffs added in the Sixth and Seventh Amended Complaints -- are time-barred. [2]

Plaintiffs, on the contrary, argue that the appropriate limitations period under the
circumstances of this case is set forth in NY CPLR, § 213-b, which establishes a seven-year
statute of limitations for suits by crime victims, under which all claims of all New York Plaintiffs
are timely filed.[3] Section 213-b provides that:

> Notwithstanding any other limitation set forth in this article … an action by
> a crime victim, or representative of a crime victim … may be commenced to
> recover damages from a defendant convicted of a crime which is the subject
> of such action, for any injury or loss resulting therefrom within seven years
> of the date of the crime.

NY CPLR § 213-b.  Plaintiffs argue that Section 213-b applies to this lawsuit because they are
victims of Chiquita's crime of providing financial aid to a designated foreign terrorist
organization.  In response, Chiquita claims that Section 213-b is inapplicable because the crime
to which Chiquita pled guilty -- a financial regulation promulgated by the Office of Foreign
Assets Control (OFAC) -- did not result in direct injury to Plaintiffs, thereby removing them
from the protective penumbra of this statute.

---

[2] Chiquita further contends that the battery claims (governed by a one year statute) of the 361 plaintiffs first
named in the New York Plaintiffs' Second through Fifth Amended Complaints are time-barred, having expired, on
the outside, by March 19, 2008, and that the wrongful death claims of the 82 plaintiffs first named in the Fifth
Amended Complaint (governed by a two-year statute) expired, on the outside, by March 19, 2009.

[3] New York courts generally apply New York statutes of limitations even when the injury giving rise to the
action occurred elsewhere.  This general rule, however, is subject to a traditional statutory exception, New York's
"borrowing statute," which provides in pertinent part: "[W]hen a nonresident plaintiff sues upon a cause of action
that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling
provisions of either (1) New York, or (2) the state where the cause of action accrued."  In presenting its argument
here, Chiquita apparently assumes the operation of the borrowing statute in urging for application of New York
statutes of limitation. However, New York's borrowing statute, as part of the "article" mentioned in Section 213-b,
is deemed supplanted by the seven-year crime victim exception to otherwise applicable local statutes of limitation.
*Aromany v. United Way of America*, 969 F. Supp. 226, 234 (S.D.N.Y.1997), citing CPLR 213-b, Practice
Commentary at 115 (West 1997 Supp.), discussed *infra*.  This  Court's analysis accordingly begins with an
examination of the applicability of the crime victim exception to the facts of this case.

Historically, New York courts have liberally interpreted NY CPLR 213-b to achieve its overarching remedial goals: "Its purpose, to extend the time a crime victim has to pursue a defendant responsible for the crime, is designed to provide a meaningful remedy to the victim and the statute should, therefore, be read expansively." *Cavanaugh v. Watanabe*, 10 Misc. 3d 1043, 806 N.Y.S.2d 848, 849 (N.Y. Sup. Ct. 2005). *See also Elkin v. Cassarino*, 248 A.D.2d 35, 680 N.Y.S.2d 601, 603 (App. Div. 1998) (the statute "does not specifically define 'crime,' does not limit the crimes to which it is applicable, and does not limit the term 'crime victim.' …. Since [the legislature] did not do so, it follows that the terms 'crime' and 'crime victim' were not intended to be restricted as they are in the Executive Law.")

New York's crime victim exception has thus been liberally interpreted to cover a broad range of "crime victims," *City of New York v. College Point Sports Ass'n Inc.,* 61 A.D. 3d 33 (2d Dept. 2009) (violation of environmental protection law by solid dumping rendered plaintiff "crime victim" for purposes of invoking 213-b in civil damage suit) -- including persons or institutions indirectly injured by the crime -- *see e.g. National Union Fire Ins. Co. of Pittsburgh v. Erazo,* 721 N.Y.S.2d 720, 187 Misc.2d 194 (N.Y. Civ. Ct. 2001) (insurance company that paid its insured for defalcations by dishonest employee was "crime victim" for purpose of Section 213-b), and a broad range of malefactors – including secondarily liable actors charged with vicarious liability for conduct of primary tortfeasors. *See e.g. Vasquez v, Wood*, 190 Misc. 2d 427, 739 N.Y.S.2d 539 (N.Y. Sup. Ct. 2001) (applying Section 213-b to vicariously liable owner of automobile operated by person convicted of criminally negligent homicide).

Further, the statute's sweep has not been confined to crimes committed inside the State of New York, contrary to the position advanced by Chiquita, *see Aramony v. United Way of America*, 969 F. Supp. 226 (S.D. N.Y. 1997) (New York seven-year crime victim exception, as

opposed to Virginia's one-year limitation period, held applicable to breach of fiduciary duty claim asserted by New York non-profit corporation against former president arising out of economic crimes committed in the Eastern District of Virginia). This Court is therefore not prepared to conclude, as a matter of law, that the statute has no potential application here to crimes allegedly committed by Chiquita outside of New York which caused or contributed to the commission of homicides committed in Colombia.

The crime victim exception does include a causation requirement, *Cavanaugh*, 806 N.Y.S.2d at 849; *Elkin*, 680 N.Y.S.2d at 604, which Chiquita further contends is not met by the indirect chain of causation described in the Plaintiffs' complaint. Plaintiffs allege that Chiquita is secondarily liable for the torture, kidnap and killing of their family members at the hands of violent terrorist groups in Colombia, on theory Chiquita conspired with and financially supported those organizations in pursuit of a common goal of suppressing labor union activism in the banana-growing regions of Colombia. Plaintiffs allege that Chiquita knew or could have reasonably foreseen that its financial support of the AUC would fuel and strengthen this terrorist group, allowing it to escalate its murderous campaign against leftist sympathizers, particularly in the Uraba region of Colombia where most of plaintiffs' family members resided, and that Chiquita's financial support of AUC actually led to this result. These allegations adequately show a plausible causal link between the Defendants' alleged crime and the Plaintiffs' injuries sufficient to justify invocation of the crime victim exception. Because of the potential applicability of Section 213-b to the facts of this case, the Court cannot determine, as a matter of law, whether the claims of newly-added Plaintiffs in the New York action are time-barred as contended by Chiquita.

Chiquita alternatively argues that even if Section 213-b were applicable, the relevant seven-year limitations period would accrue from the date of the death of each Plaintiff's decedent – not the date Chiquita entered its March 2007 guilty plea in the D.C. criminal action – because equitable tolling principles, as narrowly drawn under New York law, are not available to suspend the accrual of the statute up through the date plaintiffs allegedly first learned of Chiquita's role in financing Colombian terrorist groups.

In advancing this view, Chiquita appears to conflate and confuse principles of "equitable tolling" and "equitable estoppel," relying on restrictive estoppel applications which are not applicable here. Although these concepts are used interchangeably by New York state courts, federal courts generally distinguish between the two, *NEM Re Receivables, LLC v. Fortress Re, Inc.*, ____F. Supp. 3d ____, 2016 WL 3144390 (S.D.N.Y. 2016) (quoting *Coleman & Co Sec. v. Giaquinto Family Trust,* 236 F. Supp. 2d 288, 299 (S.D.N.Y. 2002) and *Sorof Trading Dev. Co. v. GE Fuel Cell Sys., LLC,* 842 F. Supp. 2d 502, 517 (S.D.N.Y. 2012) ("[U]nder the equitable tolling doctrine, a statute of limitations does not run against a plaintiff who was justifiably ignorant of his cause of action, [while] the doctrine of equitable estoppel may toll a statute of limitations where defendant's misconduct caused him to delay bringing suit.").

Under this dichotomy, a litigant seeking equitable tolling of a limitations period bears the burden of establishing that: (1) plaintiffs were ignorant of their cause of action due to defendant's concealment of its misconduct; (2) plaintiffs remained in ignorance of their cause of action until some length of time within the statutory period and before commencement of their action and (3) plaintiff's continuing ignorance was not attributable to lack of diligence on their part. *Koch v Christie's Intern. PLC,* 699 F.3d 141 (2d Cir. 2012); *Conklin v. Jeffrey A Maidenbaum, Esq*., 2013 WL 4083279 (S.D.N.Y. 2013). *See also Bridgeway Corp. v. Citibank*,

*N.A.,* 132 F. Supp. 2d 297, 303 (S.D.N.Y. 2001). To allege fraudulent concealment sufficient to justify an equitable tolling of a limitations period, the plaintiff must either plausibly allege that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury, or that the wrong itself was of such a nature as to be self-concealing. *De Sole v. Knoedler Gallery LLC*, 974 F. Supp. 2d 274 (S.D.N.Y. 2013); *Coble v Cohen & Slamowitz, LLP*, 824 F. Supp. 2d 568, 571 (S.D.N.Y. 2011).

In contrast, equitable estoppel bars a defendant from relying on a statute of limitations defense where the plaintiff knew of the existence of his cause of action, but "egregious misconduct" on the part of defendant induced plaintiff to forego suit until after the limitations period expired, such as where the defendant promised not to plead the statute of limitations. *Heins v Potter*, 271 F. Supp. 2d 545 (S.D.N.Y. 2003); *Sanders v New York City Dept. of Corrections*, 2009 WL 222161 at *4 (S.D.N.Y. 2009) (quoting *Abbas v Dixon*, 480 F.3d 636 (2d Cir. 2007)). Where equitable estoppel is invoked, plaintiff must show a fraud, misrepresentation or deception that is affirmative and specifically directed at preventing the plaintiff from brining suit; the failure to disclose the basis for potential claims is not enough, nor are broad misstatements to the community at large. *See Twersky v. Yeshiva University*, 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014) and cases cited *infra*.

In the instant case, the Plaintiffs do not suggest that they were induced by fraud, misrepresentation or deception from timely filing suit on known causes of action; therefore, equitable estoppel applications, invoked by Chiquita, have no application here. Conversely, Plaintiffs do allege a reasonable basis for arguing that they were not aware of their causes of action against Chiquita until March of 2007 because up until that time, Chiquita had actively concealed its financial support of foreign terrorist organizations in Colombia, such as and

27

including the AUC, and Plaintiffs had no independent reason to suspect any alliance between Chiquita and these groups which would otherwise implicate or tie Chiquita to the murders of their family members. That is, the complaint alleges facts suggesting that, due to affirmative acts of concealment on part of Chiquita, Plaintiffs remained ignorant of their causes of action until March 2007, when Chiquita's guilty plea in the D.C. criminal action --- supported by a factual proffer outlining the roles of Chiquita's senior management in creating, implementing and hiding the payment scheme -- became public. These allegations are sufficient to state a plausible claim for equitable tolling as it is defined and applied under New York law. *See New York Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 3d 268 (S.D.N.Y. 2013) (complaint stated claim for equitable tolling of limitations period for RICO civil conspiracy claim, given allegations that union pension fund could not have discovered injury that underpinned RICO claims until defendant's misconduct was publicly disclosed when criminal proceedings involving defendants and others were unsealed). This Court therefore cannot conclude as a matter of law that equitable tolling principles are unavailable to suspend the accrual date of the statute of limitations for this group of Plaintiffs, and shall deny the motion to dismiss the claims of those newly-added New York Plaintiffs falling into this sub-category of claimants.

## 2. **District of Colombia Action**

Again identifying March 19, 2007 as the most lenient accrual date on any claim, Chiquita seeks dismissal of the wrongful death claims of 1,970 Plaintiffs who were added in the Third Amended Complaint in the D.C. Action under application of the local three year statute of limitations applicable to any action "for which a limitation is not otherwise specially prescribed."

D.C. Code § 12-301 (8);[4]  *Higgins v. Washington Metro Area Transit Auth.*, 507 F. Supp. 984 (D.D.C. 1981) (applying three year statute of limitations to wrongful death claim arising from death which occurred outside  D.C.) .

In response, Plaintiffs recognize that the District of Columbia generally treats statutes of limitations as procedural, rather than substantive, but contend that an exception is made for wrongful death claims, in which instance D.C. courts will borrow the relevant statute of limitations from the jurisdiction where the fatal injuries occurred. *See e.g. Lewis v Reconstruction Finance Corp.,* 177 F.2d 654 (D.C. Cir. 1949); *Smith v Hope Village, Inc.,* 481 F. Supp. 2d 172 (D.D.C. 2007) (applying Maryland statute of limitations to wrongful death claim where fatal injury occurred in Maryland).   Because the Plaintiffs' family members were murdered in Colombia, Plaintiffs argue that D.C. law requires  application of Colombian law, resulting in application of a twenty-year general tort statute, effective up through December 27, 2002, and a ten-year statute effective since that date, and the preservation of all wrongful death claims. See Tamayo Decl., para 25, 28 [DE 741-1; DE 502-8].

Plaintiffs alternatively argue that (1) issues pertaining to the invocation of equitable tolling principles, with an accrual date beyond March 2007, preclude the resolution of this defense at the motion to dismiss stage of the proceedings, and (2) the claims of Plaintiffs added to the Third Amended Complaint relate back to the same conduct alleged in the original complaint, as do the claims of additional legal heirs and  wrongful  death beneficiaries of previously-named decedents, preserving the claims of both sets of claimants.

---

[4] Originally Chiquita sought to dismiss a larger pool of claimants, including 102 plaintiffs added to the First Amended Complaint, citing the D.C. two year wrongful death statute of limitations, D.C. Code §16-2702.   In its Reply Brief, Chiquita modified this stance, acknowledging that  because the deaths did not occur in D.C., the three year period prescribed by D.C. Code § 12-301 (8) should apply (applicable to any action "for which a limitation is not otherwise specially prescribed"), saving the claims asserted by the plaintiffs added in the First Amended Complaint.  Reply Brief on Motion to Dismiss D.C. Action [ DE 905,  p. 6 n. 3].

In response, Chiquita argues that the District of Colombia borrowing rule applies only where a wrongful death claim is brought under the substantive law of the foreign jurisdiction, and a limitations period is prescribed by the statute that creates the cause of action, and is therefore considered part of the substantive law. *See e.g.* *Klayman v. Judicial Watch, Inc.*, 2007 WL 1034936 at \*4 (D.D.C. 2007). In contrast, D.C. courts will not apply a foreign jurisdiction's statute of limitations where it "provides for general limitations periods applicable to broad classes of claims." *Id*. In this case, Chiquita argues that Colombian law does not contain a specific statutory cause of action for wrongful death.[5] Without a specific foreign statutory cause of action prescribing its own limitations period, Chiquita argues that local D.C. limitations statutes remain in place.

Because Plaintiffs chose to file their claims in a United States court in the District of Colombia, the Court agrees it is obligated to enforce the D.C. three-year statute of limitations in the wrongful death claims arising from deaths which occurred in Colombia. *See Higgins, supra*. The Court further agrees that Plaintiffs do not allege sufficient facts sufficient to support an equitable tolling of the applicable statute of limitations beyond the March, 2007 accrual date corresponding to the entry date of Chiquita's D.C. guilty plea, or the relation back of any newly-added claims to the time of filing of the original complaint. Accordingly, the Court shall grant Chiquita's motion to dismiss the wrongful death claims of all D.C. Plaintiffs first named in the Third Amended Complaint. [6]

---

[5] The ten and twenty year Colombian statutes of limitations cited by the Plaintiffs are general limitation periods applicable to all tort actions. See Second Tamayo Del. ¶ 42 n. 7 [DE 899-1]; Colombia does not have a specific statutory cause of action for wrongful death . See Arrubla Decl. ¶. 34 [DE 832-6].

[6] As to the Individual Defendants' parallel motion to dismiss the Colombian law claims of newly-added D.C. Plaintiffs on statute of limitation grounds, the Court shall defer ruling in light of the Panel's recent remand of those claims to the transferor courts for a determination of personal jurisdiction questions and related transfer issues.

### III. Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED:**

1. The Defendants' joint motion to dismiss based on *forum non conveniens* grounds [DE 741] [DE 735] is **DENIED**.[7]

2. Defendant Chiquita's motion to dismiss the newly-added Plaintiffs' Colombian law claims in the New York Action on statute of limitations grounds is **DENIED.**

3. Defendant Chiquita's motion to dismiss the newly-added Plaintiffs' Colombian law claims in the D.C. Action on statute of limitation grounds is **GRANTED** as to the wrongful death claims of those Plaintiffs first added in the  Third Amended Complaint  and **DENIED** as to those Plaintiffs first added in the First Amended Complaint.

4. The Plaintiffs' motion for a partial lift of the earlier discovery stay in order to permit limited *forum non conveniens* discovery [DE 792, 793] is **DENIED AS  MOOT.**

5. The Plaintiffs' motion for leave to supplement the record on *forum non conveniens* issues [DE 1018] is **DENIED AS MOOT.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 28th day of November, 2016.

KENNETH A. MARRA
United States District Judge

cc.  All counsel

---

[7] Defendant Chiquita's consolidated motion to dismiss, including previously-asserted FNC arguments, filed October 4, 2012  [DE 580/Case 08-MD-1916] is denied as moot.